THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent, | ) | Case No. 23-cv-963 |
| | ) | |
| vs. | ) | |
| | ) | Hon. Martha M. Pacold |
| JAMES J. CARROLL, | ) | |
| | ) | |
| Petitioner. | ) | |

**JAMES J. CARROLL'S REPLY IN SUPPORT OF HIS MOTION
TO VACATE OR SET ASIDE HIS SENTENCE**

The Sixth Amendment to the United States Constitution "requires effective assistance of counsel at critical stages of a criminal proceeding." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). This right applies to sentencing in both capital and noncapital cases, and "'any amount of [additional] jail time has Sixth Amendment significance.'" *Id.* (quoting *Glover v. United States*, 531 U.S. 198, 203 (2001)); *see also Lewis v. Zatecky*, 993 F.3d 994, 1004 (7th Cir. 2021) (stating that the answer to the question of whether sentencing is a "critical" phase "is an unambiguous yes").

Petitioner James J. Carroll's counsel failed him during this critical stage. His first lawyer, Jeffrey Steinback, abandoned Carroll for years while Carroll awaited sentencing. Steinback's actions in Carroll's case and in others infuriated judges in multiple districts, and certainly did not help Carroll's cause before the sentencing judge here. Then, in the hours before sentencing and having been barred from practicing in this district, Steinback tapped Substitute Counsel to represent Carroll. Despite a twenty-three day extension of time to prepare, Substitute Counsel waited

until the day before sentencing to file a sentencing memorandum that was signed by Steinback, failed to object to outdated information in the three-year-old presentence investigation report, and, most shockingly, failed to bring to the sentencing court's attention the fact that one of Carroll's codefendants—who had a nearly identical cooperation deal with the government and the same Guidelines range—had received a sentence of one day, time served.

Taken together or independently, Steinback and Substitute Counsel failed to effectively represent Carroll leading up to and during his sentencing, and their failures resulted in prejudice to Carroll. This was a violation of Carroll's Sixth Amendment right to counsel. Accordingly, this Court should grant Carroll's section 2255 motion, and order a new sentencing hearing.

## I. Carroll's Sixth Amendment claim is constitutionally significant.

The government contends that section 2255 relief is not available here because the asserted error is not one "of constitutional dimension." *See* Government's Response ("Govt. Resp.") at 27-29. Specifically, the government argues that the fact that Carroll received a sentence that was below the Guidelines range (because the sentencing court granted the government's §5K1.1 motion) forecloses a constitutional deprivation. Govt. Resp. at 28-29. This is a misrepresentation of Carroll's argument. Carroll is not directly challenging his sentence; he is challenging the conduct of his lawyers before and during his sentencing hearing. Carroll's Sixth Amendment claim is one of constitutional dimension appropriate for section 2255 relief.

The cases the government cites do not hold otherwise. In *Hawkins v. United States*, 706 F.3d 820 (7th Cir. 2013) (*Hawkins I*), for example, the defendant brought a motion under section 2255 to correct what he claimed was an illegal sentence—he did not argue that he had been deprived of his Sixth Amendment right to counsel. Indeed, *Hawkins* "involve[d] no claim of constitutional error"; there was simply "a claim that the sentencing judge miscalculated the advisory guidelines range . . . ." *Hawkins v. United States*, 724 F.3d 915, 916-17 (7th Cir. 2013) (*Hawkins II*). That is not the case here. Carroll is challenging his counsels' errors, not any error by the sentencing court.

The other cases the government cites—*United States v. Jones*, 635 F.3d 909, 916 (7th Cir. 2011), and *Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015)—acknowledge that there can be a successful ineffective-assistance claim if "an attorney's unreasonable failure to identify and bring to a court's attention an error in the court's Guidelines calculations . . . results in a longer sentence . . . ." *Jones*, 799 F.3d at 916. These cases do not say that a Guidelines calculation error is always required; it just so happened that in both cases the defendant argued that one had occurred. Indeed, there are hundreds of post-conviction cases in which a defendant argues that his Sixth Amendment right to counsel was violated during the sentencing phase because—like here—his lawyer failed to properly argue facts in mitigation; *Strickland v. Washington*, 466 U.S. 668 (1984), is one of them. Granted, many of those cases are death penalty cases involving state sentencing schemes, but there is a constitutional right to counsel in both capital and noncapital cases, and "any amount

3

of [additional] jail time has Sixth Amendment significance." *Lafler*, 566 U.S. at 165 (quoting *Glover*, 531 U.S. at 203). In the right case—like Carroll's—even a below Guidelines sentence can be "fundamentally unfair." *See Jones*, 635 F.3d at 915.

Regardless of the Guidelines calculations or whether the sentence received is within or below the range, if a defendant received counsel at sentencing that was below an objective standard of reasonableness and that resulted in a sentence that was even one day longer than the one he would have otherwise received, there is a Sixth Amendment deprivation. *See Glover*, 531 U.S. at 203. That is what Carroll is arguing here. He is challenging his attorneys' conduct before and during his sentencing hearing. He is not directly challenging his sentence, arguing that his sentence is unreasonable, or asserting that the term is "greater than necessary to meet the goals of § 3553(a)" (although it is). *Compare United States v. Purham*, 795 F.3d 761, 765 (7th 2015); *United States v. Noel*, 581 F.3d 490, 500-01 (7th Cir. 2009); and *United States v. Gibson*, 996 F.3d 451, 468-69 (7th Cir. 2021). This Court should reject the government's attempt to mischaracterize Carroll's argument, and it should conclude that his Sixth Amendment claim is one of constitutional dimension.

The government's discussion of unwarranted-disparity cases also misses the mark. Again, unlike in the cases the government cites, Carroll is not directly challenging his sentence. He is not arguing that his sentence is substantively or procedurally unreasonable or that the sentencing court erred in weighing or failing to march through the sentencing factors. *Compare, e.g., United States v. Grigsby*, 692 F.3d 778 (7th Cir. 2012). In the cases cited by the government, counsel raised the

4

arguments in mitigation that were most relevant to their clients; the challenge was to the court's failure to enumerate or properly consider the factor when imposing sentence. *See, e.g.*, *United States v. Pape*, 601 F.3d 743, 749-50 (7th Cir. 2010) (arguing that the court "failed to consider his evidence of an unjustified difference in the length of sentences across districts among defendants convicted of" the same type of crime). Here, in contrast, Substitute Counsel never raised the key argument in mitigation and thus never gave the sentencing court the chance to weigh the fact that Carroll's codefendant who had received the same cooperation agreement and who had the same Guidelines calculations received a sentence of one day, time served.

Although maybe not required by § 3553(a), the statute gives the sentencing court the discretion to "consider disparities within a particular case." *See Grigsby*, 692 F.3d at 792. In a case like this one, with multiple cooperating defendants with the same plea deal, the sentence of similarly-situated codefendants is highly relevant. Because of counsels' failures, the sentencing court did not have the opportunity to appropriately exercise its discretion. Carroll's challenge, which is to his counsels' conduct, rather than a direct challenge to his sentence, is of constitutional significance and is suitable for section 2255 relief.

## II. Steinback's conduct in this case resulted in a sentence for Carroll that was longer than the one he would have otherwise received.

Had Steinback performed in an objectively reasonable manner, Carroll would have received a sentence lower than the one he received. The government appears to accept that Steinback's performance fell below a reasonable standard, and it argues only that Carroll cannot show prejudice. *See* Govt. Resp. at 24-26.

5

The relevant period for assessing Steinback's performance here is the time between codefendant Asif A. Aslam's sentencing hearing—November 4, 2020—and the date Carroll was finally sentenced—September 9, 2022. *See* Motion at 4-8. Carroll was always going to be one of the last two defendants to be sentenced; his sentencing hearing was routinely postponed each time Aslam's hearing was continued. *See* Dkt. 364-411.[1] Carroll is not arguing that he should have been sentenced "as originally scheduled on June 11, 2019[.]" *See* Govt. Resp. at 25. He was never going to be sentenced before Aslam. Nor is Carroll contending that one or two continuances, or some amount of delay for pandemic reasons, was improper. Instead, Carroll is arguing that Steinback's repeated motions to continue the sentencing hearing between November 4, 2020, and September 9, 2022, his failure to timely file a sentencing memorandum on Carroll's behalf, and his failure to disclose until the week of sentencing the fact that he was barred from representing Carroll at his hearing amounted to a performance that fell well below an objective standard of reasonable representation. The government does not really contest this point. *See* Govt. Resp. at 26 (stating that it "does not condone Mr. Steinback's conduct in Iowa or in this jurisdiction"). Nor can it, following the district court's opinion in the Northern District of Iowa and Steinback's discipline proceedings in this Court. *See In re Steinback*, No. 22-MC-2 CJW, 2002 WL 1997192 (N.D. Iowa June 6, 2022); Dkt. 454, Exhibit A.

---

[1] Unless otherwise noted, references to the docket are to the docket in the underlying criminal case, 14 CR 287.

Despite the government's protestations otherwise, Steinback's conduct had a real effect on Carroll's sentence. As the years wore on and the motions to continue built up, Steinback's behavior slowly affected the judges he appeared before. *See, e.g.*, *In re Steinback*, 2002 WL 1997192. The sentencing judge in this case was particularly frustrated with Steinback, as was demonstrated by his warning to Substitute Counsel about mentioning Steinback's name. Carroll Sent. Hr'g Tr. 8:3-13 ("I think you are going to be stepping into dangerous waters if you bring up Mr. Steinback[,]" and "So I'm just saying if you are going to bring up Mr. Steinback, be careful in what you say. I'm not barring you from doing so. But be careful of what you say."). Indeed, the difference in tone between Carroll's sentencing hearing and Aslam's sentencing hearing is striking. *Compare* Carroll Sent. Hr'g Tr. *with* Aslam Sent. Hr'g Tr. In another case before him, the sentencing judge had Steinback read the Iowa district court's opinion aloud in open court in front of his client. Courthouse News Service, June 29, 2022, https://www.courthousenews.com/illinois-district-judge-questions-the-integrity-of-accused-murderers-attorney/ (last visited May 24, 2023) (Exhibit A). The government cannot claim that the sentencing court's anger at Steinback did not affect Carroll's sentence.

Carroll was also prejudiced by Steinback's failure to timely file a sentencing memorandum and by Steinback's last-minute decision to have Substitute Counsel appear at the sentencing hearing. Instead of informing Carroll of his disciplinary trouble in this district—about which Steinback was well aware by June 2022—Steinback waited until the week of the sentencing hearing to tell Carroll that

7

Substitute Counsel would be appearing in his place. Carroll was given no real ability to object, but it is unlikely that Carroll would have hired Substitute Counsel if given a choice. Substitute Counsel is a younger lawyer with far less experience representing white collar defendants in federal court. Steinback put both Carroll and Substitute Counsel in a difficult position. He gave Substitute Counsel outdated information, did not suggest the most persuasive argument in mitigation, and did not allow Substitute Counsel adequate time to prepare or give Carroll a meaningful chance to object to his representation. The result of all of this—as discussed in more detail below—is that Carroll received a sentence higher than the one he would have otherwise received.

### III. Independently or taken together with Steinback's conduct, Substitute Counsel's representation at the sentencing hearing also violated Carroll's Sixth Amendment right to counsel.

Carroll can also show that Substitute Counsel "performed in a deficient manner during" Carroll's sentencing hearing and that, "'but for . . . counsel's unprofessional errors, there is a reasonable probability that the results [of his sentencing hearing] would have been different.'" *Fuller v. United States*, 398 F.3d 644, 650 (7th Cir. 2005) (citation omitted). Substitute Counsel's failure to raise at Carroll's hearing the most important point in mitigation satisfies the performance prong. This error cannot be explained away as a strategic decision; it "arose from oversight, carelessness, ineptitude, or laziness.'" *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (citation omitted) (cited with approval in *Ramirez*, 799 F.3d at 855).

As set forth in Carroll's section 2255 motion, the fact that Aslam received a noncustodial sentence was important to Carroll's case because Carroll and Aslam had

8

received the same cooperation deal from the government. Both cooperated early, both had a Guidelines range of 63-78 months driven largely by the loss amount, and both received a two-thirds reduction off the low-end of the range under §5K1.1 following their continued cooperation. Yes, it is true that Aslam had compelling health and family circumstances. *See generally*, Aslam Sent. Hr'g Tr. But he also was involved in more than one bank fraud scheme. *See* Dkt. 166 at 6-8. At the very least, the starting point was the same and Aslam's sentence was highly probative to Carroll's request for a lower sentence.

The question of whether a reasonably competent lawyer would have raised the issue of Aslam's one-day sentence at the sentencing hearing is not a hypothetical one. Codefendant Jeffrey J. Budzik's sentencing memorandum is proof of what constitutionally-effective counsel needed to do. Budzik's lawyer filed her sentencing memorandum well before the scheduled sentencing hearing and she repeatedly referred to Aslam's sentence. Dkt. 462. Like Carroll, Budzik was due to be sentenced after Aslam and he was the recipient of a cooperation agreement. Budzik was also the beneficiary of an updated PSR, which included Aslam's sentence and, remarkably, a recommendation from the probation officer that Budzik also receive one day, time served, lest there be unwarranted disparity between similarly-situated defendants. Dkt. 462 at 4. Specifically, the probation officer said:

> The defendant has been on bond since June 6, 2014. This not only demonstrates that he is able to live a law-abiding life for a lengthy period of time but also that prosecution of this case has been part of his life for at least eight years. As reflected in the defendant's version, he has gone through numerous life changing events since that time. Although it is the defendant's own fault that he is involved in the

9

> criminal justice system and this case at all, he is still pending sentencing due to his cooperation agreement. That is, the defendant cooperated with the government by participating in proffer interviews, testifying before the grand jury, and testifying at an unrelated trial. Accordingly, this officer concurs with the government that a downward departure is appropriate in this case. The defendant's codefendant, Asif A. Aslam, who was involved in the transactions with the defendant, had the same guideline range as the defendant, and also cooperated, and was sentenced to one day time served with no supervised release to follow. As such, the recommended sentence is appropriate to eliminate sentencing disparity between he and his codefendant with whom he mutually participated in the scheme.

Dkt. 462 at 3-4 (quoting PSR, Sentencing Recommendation, page 2). The same can be—and should have been—said for Carroll.

In contrast, Carroll's late-filed sentencing memorandum made no mention of Aslam's one-day sentence. Nor did the outdated PSR include the outcome in Aslam's case. Not one person—not Substitute Counsel, not the sentencing court, not the prosecutor, not the probation officer—mentioned Aslam's name or sentence at Carroll's hearing. This is particularly egregious because the government did discuss the sentences of two other codefendants who had not cooperated, but who had received relatively-low sentences. Substitute Counsel failed to call the government out for its selective recitation of Carroll's codefendants' sentences and he did not raise Aslam's sentence on his own. Indeed, it appears that no one at the sentencing hearing was aware that Aslam had been sentenced at all. The difference between Carroll's counsels' performance before and during the sentencing hearing and Budzik's is telling and dispositive. Unlike Budzik's lawyer, Carroll's counsels did not perform in an objectively reasonable manner.

Despite the other work that Substitute Counsel may have done during the hearing (and the government makes that work sound a lot more persuasive than it was), his failures to perform basic research into the facts of Carroll's case, to object to the outdated information in the PSR, and, especially, to raise Aslam's sentence with the sentencing court resulted in representation that fell below an objective standard of reasonableness.

Carroll can also show that, had the sentencing court been aware of Aslam's one-day sentence, Carroll would have received a lower sentence. Carroll is not arguing that his sentence would have been the same as Aslam's, just that it would have been lower. That is all that is required under the Sixth Amendment. *See Glover*, 531 U.S. at 203.

For two cooperating defendants who started with the same Guidelines range, the difference between 41 months in prison and one day, time served, is vast. It is true that Aslam's health and family circumstances were unique, but at the very least, a discussion of Aslam's sentence would have worked to pull Carroll's sentence down, even by a month or two. *C.f. Hawkins I* (discussing the "anchoring effect"). The delta between the two defendants is just too big to support such a disparity. The questions raised by the government in its response as to Carroll—"why such an upstanding citizen committed" such a fraud and "how a noncustodial sentence could meet the § 3553 factor of general deterrence"—applied equally to Aslam, and yet he received a sentence of one day. *See* Govt. Resp. at 38.

11

Carroll and Aslam's situations are not "night-and-day[,]" as the government suggests. *See* Govt. Resp. at 39. In addition to their cooperation agreements and their identical Guidelines calculations, both had, according to the government, significant roles in the scheme at issue here, and both suffered mightily after entering their guilty pleas. *See* Dkt. 306 at 7; Dkt. 363 at 6. In addition, Aslam had a direct role in the fraudulent condo sales, and he was not a one-time offender.

To read the government's response, you would think that Aslam was an uneducated, low-level participant in this scheme, but that was far from the case. "Aslam was the chief executive officer of Aslam Group, Inc., and an officer of Downtown Property Management, LLC." Dkt. 166 at 2. He was an experienced computer science and finance professional with a college degree, and he had done some work toward obtaining an MBA. Dkt. 306 at 8. As part of the scheme, Aslam "solicited straw buyers to purport to purchase the properties, although they would not be paying to fund the purchase, nor did they intend to reside in the properties. . . . [He] induced the straw buyers to participate by promising them a package of financial incentives, including that the developer would make their down payments, and pay homeowners' assessments and closing costs." Dkt. 306 at 3. He used money from "Barr's company"[2] for the downpayments, and he attended the closings "and falsely caused the submission of false loan documents" to lenders. Dkt. 306 at 3. 13th

---

[2] In its response, the government conflates Carroll's actions with those of his codefendant Warren N. Barr III. *See* Resp. at 1-2. It was Barr who sought people out to recruit straw buyers and it was Barr who organized the fraudulent deals, including setting the inflated purchase prices. Dkt. 131 at 4; Dkt. 306 at 3.

& State LLC paid Aslam substantial fees for this work, which were concealed by paying "corporations designated by Aslam, such as Mughal Sports Corporation, SM Technologies, and Times Publications, rather than to Aslam himself." Dkt. 131 at 4.

Aslam was "essential to this scheme to defraud." *See* Dkt. 306 at 7. He "found the buyers and used his personal presentation as a successful professional to convince them to participate. He used his own companies to lend an even greater veneer of legitimacy to his pitch. . . . Without [Aslam], straw buyers would not have been engaged, lies would not have been made to the banks, and the closings would not have occurred." Dkt. 306 at 7.

Nor was Aslam a one-time offender. In addition to the sixty fraudulent mortgage loans to which Aslam was held responsible under this scheme, Dkt. 166 at 2-4, Aslam also acknowledged that he and Budzik knowingly participated in a second bank fraud scheme involving another real estate development company. Dkt. 166 at 6-8. Aslam's actions there resulted in eleven fraudulently-obtained mortgage loans, and a loss of an additional $2,739,338. Dkt. 166 at 7-8. Aslam's conduct in this case and the fact that he was involved in more than one bank fraud scheme arguably makes him more culpable than Carroll. At the very least, he was similarly-situated and his one-day sentence needed to be addressed at Carroll's hearing.

The government's assertion that it "did not specifically oppose a non-custodial sentence" in Aslam's case is misleading. *See* Govt. Resp. at 33, 38. Although the government did not dispute the facts related to Aslam's health and family circumstances, and it acknowledged that the court could take those issues into

13

account, it suggested that a custodial sentence would still be appropriate. *See* Aslam Sent. Hr'g Tr. 26:4-15. Specifically, the government stated that there were "ways to address" the coronavirus situation, "such as a long report date and things of that sort[,]" and that "the situation in many of the facilities is not as dire as" Aslam's lawyer had portrayed it. Aslam Sent. Hr'g Tr. 26:9-15. As with Carroll, the government recommended that Aslam receive 42 months in prison, despite his circumstances. Aslam Sent. Hr'g Tr. 24:15-19.

Similarly, the government's claim that the sentencing court "correctly" reduced Aslam's sentence because of "family ties and responsibilities[,]" but "correctly found that they were absent in Carroll's situation" wrongly assumes that the court compared Carroll's situation to Aslam's. *See* Govt. Resp. at 35-36. The sentencing court did not address, but then reject, the argument that Carroll's sentence should be more like Aslam's. Aslam's sentence was not part of the discussion or analysis at all. *Compare United States v. Gibson*, 996 F.3d 468, 469 (7th Cir. 2021) (noting that the district court had "expressly considered the need to avoid an unwarranted sentencing disparity between [two codefendants], who had similar roles in the conspiracy and identical Guidelines ranges"). And although it may ordinarily be the case that such an analysis is presumed, that cannot be true here because of Substitute Counsel's errors and omissions.

Carroll is seventy-two years old, he has two jobs, and he has health issues of his own. His life may not be a "total wreckage[,]" *see* Govt. Resp. at 39, but, like Aslam, he has suffered extensively from the fallout of his criminal conduct. As a result of his

14

guilty plea, Carroll has gotten divorced, is estranged from one of his children, and has lost two significant jobs. The sentencing court felt that no good would be served by sending Aslam to prison, but the same could be said for Carroll. Carroll is a productive member of society, he has done well to bounce back from the significant mistake he made many years ago, and, like Aslam, he has shown that he does not need to be incarcerated. At the very least, Carroll deserved a sentence lower than the one he received. Had he been represented by constitutionally-effective counsel, he would have gotten such a sentence. Because the outcome of the sentencing hearing would have been different absent counsels' errors and omissions, Carroll was prejudiced as a result.

**IV. Carroll's petition does not include an involuntariness claim.**

Finally, the government spends nearly ten pages of its response addressing an involuntariness claim that Carroll did not make. Although the government's conduct here is unlikely to encourage the kind of full-throated cooperation it received from Carroll, Carroll is not arguing that his cooperation or plea agreement was involuntary. Carroll pleaded guilty because he was guilty, and he does not seek to minimize his criminal conduct. The facts Carroll included in his petition were intended to highlight the extent of his cooperation and trust in the government, how he came to hire Steinback, and the significance of that decision. The Court need not address the government's arguments in pages 13-23 of its response.

## **Conclusion**

Fairness dictates that Carroll get a sentencing hearing with all the relevant information before the Court; like the one Budzik will receive. For all the reasons set forth above and in his section 2255 petition, this Court should grant Carroll's motion to vacate or set aside his sentence and set his case for resentencing. In the alternative, the Court should grant Carroll's request for an evidentiary hearing and a reopening of the record.

Date: May 24, 2023

Respectfully submitted:

/s/ Katie Krickbaum
Katherine Krickbaum
Cotsirilos, Tighe, Streicker,
    Poulos & Campbell, Ltd.
55 East Monroe, Suite 3250
Chicago, IL 60603
(312) 263-0345
kkrickbaum@cotsiriloslaw.com
*Attorney Petitioner James J. Carroll*