UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES J. CARROLL,

    Petitioner,

v.

UNITED STATES OF AMERICA,

    Respondent.

Case No. 1:23-cv-00963

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

The Government's motion for leave to file a supplemental pleading, [11], is granted. Petitioner James Carroll's motion for oral argument or alternative relief, [20], is granted insofar as it asks the court to take notice of the one-day sentence imposed on petitioner's codefendant, Jeffrey Budzik. In all other respects, the motion is denied. Carroll's motion to vacate or set aside his sentence under 28 U.S.C. § 2255, [1], is denied. The court declines to issue a certificate of appealability.

## BACKGROUND

The court draws the following facts from the record in Carroll's criminal case, *United States v. Carroll*, No. 1:14-cr-00287-6 (N.D. Ill.).

### I. The Offense Conduct

Carroll's underlying criminal conviction arose from his involvement in the development of a high-rise condominium building in Chicago, Illinois. [131] at 2.[1] Carroll was the chief financial officer (and a member) of 13th & State LLC, a limited liability company created to develop the building. *Id.* Warren Barr III, a real estate developer and the CEO of 13th & State LLC, oversaw the project development. [360] ¶ 10. The project was funded by loans from various financial institutions, at least some of which were backed by guarantees signed by Carroll, Barr, and other investors. [131] at 2–3. The proceeds from sales of condominium units were to be used to pay the LLC's lenders, the building's general contractor, and certain other

---

[1] Numbers in square brackets, [], refer to docket entries in the underlying criminal case, *United States v. Carroll*, No. 1:14-cr-00287-6 (N.D. Ill.). Numbers in angle brackets, <>, refer to docket entries in this case. Page numbers refer to the CM/ECF page number.

investors. *Id.* at 3. The remaining proceeds would go to Carroll, Barr, and the other members of the LLC. *Id.*

Units began being offered for sale in approximately November 2004. *Id.* at 2. However, by the spring of 2007, the LLC was encountering difficulty selling the remaining units at prices that would allow it to cover its costs and repay its loans, and approximately 80 units remained unsold. *Id.* at 3. In response, Carroll and Barr engaged in a scheme known as a "builder bailout" fraud. [360] ¶ 8. As part of the scheme, Carroll, Barr, and Robert Lattas—an attorney who represented the LLC at real estate closings, *id.* ¶ 11—recruited Asif Aslam and Leonardo Sanders to facilitate the sale of the remaining units to straw buyers. *Id.* ¶ 17. Rather than report the true sale price to lenders, the LLC instead reported inflated prices. *Id.* At the closings, several of the straw buyers were represented by Jeffrey Budzik, another attorney. *Id.* ¶ 12. In his role as CFO, Carroll worked with Barr and Lattas to calculate the inflated prices to be reported to lenders on HUD-1 forms. *See* [131] at 3–6.

According to Carroll's declaration in support of his § 2255 motion, federal agents approached him at his home in late 2012, asking to speak about the condominium project. [1-1] ¶ 2. He met with the agents at a nearby restaurant, where he answered their questions for about 90 minutes to two hours. *Id.* ¶ 3. He also agreed to show the agents the LLC's records. *Id.* ¶ 4. At a later meeting, one of the agents told him that he was not a target of the investigation at that time. *Id.* ¶ 5. Carroll also agreed to testify before the grand jury. *Id.* ¶ 6. On the day of his testimony, he met with a prosecutor and one of the agents, during which time the prosecutor informed him that he was now a target of the investigation. *Id.* While waiting to testify, Carroll observed to the agent that he would need a lawyer. *Id.* ¶ 7. According to Carroll, the agent suggested Jeffrey Steinback "as a lawyer who would be good for someone like [Carroll], who was committed to cooperating with the government." *Id.* Shortly after his grand jury testimony, Carroll hired Steinback. *Id.* ¶ 10.

After hiring Steinback, Carroll continued his cooperation, sitting for at least two additional proffer sessions (at which Steinback appeared with Carroll) and answering questions truthfully. *Id.* ¶ 11.

## II.   Pre-Sentencing Proceedings

On May 15, 2014, a grand jury returned a thirteen-count indictment, which named Barr, Lattas, Budzik, Aslam, Sanders, and Carroll as defendants. [1]. Count Nine of the indictment (the only count that named Carroll as a defendant) charged Carroll with one count of bank fraud involving causing Bank of America to fund an approximately $417,000 loan for Barr to purchase a particular unit. *Id.* at 17; *see* 18 U.S.C. § 1344. The case was assigned to Judge Norgle, who presided until the case was reassigned to the undersigned on Judge Norgle's retirement in October 2022. [449]. On February 3, 2016, Judge Norgle accepted Carroll's guilty plea. [130]. The plea was pursuant to a written plea agreement. *See* [131]. Carroll does not

2

dispute the voluntariness of the plea or his guilt of the underlying offense. *See* <13> at 15. Each of Carroll's codefendants also pleaded guilty. *See* [110] (Budzik); [132] (Lattas); [149] (Sanders); [151] (Barr); [165] (Aslam).

By agreement of the parties, Carroll's sentencing was initially set for January 17, 2019. [285]. Just over a month before the sentencing, however, Steinback requested the first of many extensions. *See* [296]. The record does not reflect the reason for this request, but the motion was unopposed, and the sentencing was rescheduled for June 11, 2019. [295]. In the leadup to the rescheduled sentencing, the United States Probation Office filed its presentence investigation report, [360], and the Government filed its sentencing memorandum, [363]. The day before the new sentencing date, however, Steinback again requested an extension. *See* [365]. The extension was again unopposed, and the sentencing was reset for August 28, 2019. [364]. By early 2020, Steinback had sought (and received) a total of seven extensions, and the sentencing was scheduled for April 21, 2020. [387]; *see* [368]; [372]; [376]; [382].

The April 21, 2020 date was stricken by the Northern District of Illinois's Second Amended General Order 20-0012, which continued "[a]ll . . . sentencing hearings scheduled to begin on or before May 1, 2020" due to COVID-19. [394] § 4(g). Judge Norgle reset the sentencing for October 6, 2020. [403]. He then reset the sentencing three additional times, to September 14, 2021, but the docket does not reflect whether he did so on Steinback's motion or sua sponte. [406], [409], [414]. Three days before the new sentencing date, Steinback filed an emergency motion for a continuance, citing a religious observance and an emergency dental surgery. [415]. Judge Norgle granted the motion, [416], and reset the sentencing for September 30, 2021, [417]. Three days before that date, Carroll filed another emergency motion to continue, this time citing his brother's medical condition. [419]. Judge Norgle granted the motion and reset the sentencing for November 2, 2021, [421], but later rescheduled it for November 12, 2021, [422].

Judge Norgle then canceled the November 12, 2021 date "[d]ue to medical issues involving defendant's attorney," [426], and set a new sentencing date of December 21, 2021, [427]. This pattern continued, with Steinback filing (and Judge Norgle granting) five additional motions to continue, resulting in a new sentencing date of August 17, 2022. *See* [428]; [429]; [430]; [431]; [432]; [433]; [434]; [435]; [436]; [437].

In the meantime, Judge Norgle sentenced all but one of Carroll's codefendants:

- On November 30, 2017, Judge Norgle sentenced Sanders to 28 months of imprisonment. [229].
- On October 2, 2018, Judge Norgle sentenced Lattas to 63 months of imprisonment. [281].

3

- On February 1, 2019, Judge Norgle sentenced Barr to 87 months of imprisonment. [362] at 46.
- On November 4, 2020, Judge Norgle sentenced Aslam to one day of time served. [475] at 43.[2]

## III. Steinback's Disciplinary Proceedings

Meanwhile, the United States District Court for the Northern District of Iowa sanctioned Steinback and held him in contempt. *See In re Steinback*, No. 22-MC-2-CJW, 2022 WL 1997192 (N.D. Iowa June 6, 2022). In its ruling, the Iowa federal court documented Steinback's numerous requests for continuances (of both trial and sentencing) in an Iowa federal criminal case. *See id.* at *1–3. Following an evidentiary hearing (which Steinback also requested to continue on numerous occasions), the court found that Steinback had "disobeyed court orders, was not candid with the Court, and misled the Court." *Id.* at *8. However, the court "stop[ped] short of finding [Steinback] committed perjury." *Id.* The court noted that Steinback "repeatedly filed motions to continue hearings at the last minute . . . under frivolous or false pretenses." *Id.* at *11. The court also found that Steinback had failed to appear at a sentencing hearing despite being ordered to do so, could not provide documents to support his alleged medical ailments (which he had used as the basis for requesting continuances), and would not produce documentation of his alleged communications with his client. *Id.* at *8–9. The court determined that an appropriate sanction was (1) a public reprimand, (2) an order barring Steinback from practicing law in the Northern District of Iowa without approval from that court's Chief Judge, and (3) a $5,000 fine. *Id.* at *11. The court also ordered that notice be provided to the other jurisdictions where Steinback was admitted to practice, including the Northern District of Illinois. *Id.*

In response to the Iowa federal court's order, the Executive Committee of this district issued a rule to show cause ordering Steinback to explain why it should not impose reciprocal discipline. [454-1] at 2; *see* N.D. Ill. L.R. 83.26(c). Steinback requested (and received) three extensions of the deadline to respond, the last of which "was conditioned on Mr. Steinback's voluntary commitment to cease any practice before this court pending the resolution of" the rule to show cause. [454-1] at 2. After Steinback (through counsel) responded, the court issued an order on September 20, 2022, suspending Steinback from the practice of law in this district "unless co-counsel, who has filed an appearance on the case, is present and/or signs all pleadings until further order of the court." *Id.* On November 4, 2022, the Executive Committee amended its order to (1) bar Steinback from "requesting a continuance in any case on the basis of his personal schedule or physical or health limitations."

---

[2] The remaining codefendant, Budzik, was sentenced after Carroll's sentencing. *See* [480]. Because by that time Judge Norgle had retired, the undersigned presided at Budzik's sentencing. *See* [485]. Budzik was sentenced to time served. *Id.* at 69–70.

4

*Sypolt v. Ill. Gaming Bd.*, No. 1:19-cv-05991, Dkt. 115 at 2 (N.D. Ill. Nov. 4, 2022) (copy of Executive Committee order). It also ordered Steinback (and the required co-counsel) to file a certification "that their client has reviewed and accepts the restrictions imposed by" the order within 14 days of their appearance in any new case. *Id.*

### IV.   Carroll's Sentencing

On August 16, 2022—the day before what was then scheduled to be the sentencing—an additional attorney, Sami Azhari, filed an appearance on Carroll's behalf. [438]. According to Carroll's declaration, Steinback told Carroll that hiring another lawyer was necessary to help with Sentencing Guidelines arguments, and Carroll gave Steinback $2,000 to hire Azhari. <1-1> ¶ 14. Azhari filed his own motion to continue the sentencing date, citing his need for time to become familiar with the case. [439]. The motion did not reference Steinback's disciplinary proceedings. *See id.* Judge Norgle granted the motion and continued the sentencing to September 9, 2022. [440].

Carroll's thirteen-page sentencing memorandum was filed on the docket on September 8, 2022. *See* [441]. Although Steinback was the only attorney who signed the memorandum, it was filed using Azhari's CM/ECF account. *See id.* The memorandum analyzes the applicable United States Sentencing Guidelines calculations and the 18 U.S.C. § 3553(a) sentencing factors. *See id.* It also attaches 11 character letters. *See* [441-1]. It describes Carroll as "a devoted and dedicated father, husband, son, brother, uncle, and friend" whose conduct "was not driven by any sort of evil malice" but rather "born of desperation and an inability to let a real estate venture fail." [441] at 12. It emphasizes Carroll's good behavior while on pretrial release, his continued employment, and his substantial cooperation with the investigation. *Id.* at 9.

The next day, the sentencing hearing finally went forward. *See* [442]. Azhari appeared on Carroll's behalf. [445] at 2. Steinback did not. Azhari did not challenge or otherwise object to the presentence investigation report. *Id.* at 3. In their respective sentencing memoranda, the parties had agreed that Carroll was a first-time offender with an offense level of 26, and thus that the applicable Guidelines range was 63 to 78 months. [363] at 5; [441] at 4. However, the Government sought a one-third downward departure under § 5K1.1 of the Sentencing Guidelines due to the substantial assistance Carroll had provided the Government during its investigation. [363] at 5; [445] at 4. Thus, the Government asked for a sentence of 42 months. [363] at 5–6; [445] at 4. The Government noted that Carroll was a Certified Public Accountant and the CFO of the LLC and argued that a prison term was a necessary deterrent for others who might abuse their similar positions. [445] at 17. The Government also noted that Judge Norgle had previously sentenced codefendants to imprisonment. *Id.* at 18–19.

5

Azhari asked for a noncustodial sentence. *Id.* at 5. He began by reviewing Carroll's life background and family history, emphasizing "the people [Carroll] has surrounded himself with throughout his life and the people that have instilled the work ethic that he has carried with him throughout his entire life." *Id.* at 7. He continued on to argue that Carroll "recognize[d] the seriousness of his conduct" and that of his codefendants, contending that Carroll "always intended to come forward and admit his guilt and offer his cooperation." *Id.*

At this point, Azhari began to reference Steinback, leading to the following exchange with Judge Norgle:

> MR. AZHARI: . . . And it was against this backdrop that [Carroll] retained an attorney that could do exactly that, and that's the reason he retained Mr. Steinback. And he directed that attorney—
>
> THE COURT: I think you are going to be stepping into dangerous waters if you bring up Mr. Steinback.
>
> MR. AZHARI: Understood.
>
> THE COURT: You have filed an appearance in this case, is that correct?
>
> MR. AZHARI: I have, Your Honor.
>
> THE COURT: All right. So I'm just saying if you are going to bring up Mr. Steinback, be careful in what you say. I'm not barring you from doing so. But be careful of what you say.
>
> THE COURT: Understood, Judge.

*Id.* at 8.

Azhari continued on, noting (without mentioning Steinback by name) that Carroll had "retained an attorney and directed that attorney to engage in meaningful discussions with the government and to explain everything that he had to say in proffer." *Id.* He emphasized Carroll's cooperation, that he was a first-time, non-violent offender, and that he had lived "an exemplary life" in the years since the scheme concluded. *Id.* at 9–10. Azhari also emphasized Carroll's age and health issues and that he had continued working despite his conviction making it difficult to continue working as a CPA. *Id.* at 10–11.

6

Carroll gave an allocution, which he began by apologizing for his conduct. *Id.* at 19. He explained that, aside from the crime to which he pled guilty, he had "been a non-violent family-oriented and community-minded person." *Id.* at 20.

Judge Norgle sentenced Carroll to 41 months of imprisonment, to be followed by two years of supervised release, along with over $12 million in restitution. *Id.* at 24. He began by noting that Carroll had accepted responsibility, which he called "a very significant factor." *Id.* at 21. But he found it "hard to explain" why someone with Carroll's "background . . . would do what [he] did," except because of "simple greed." *Id.* He emphasized that the scheme was "not just an isolated incident, a one-shot deal" but was a sophisticated scheme involving 67 separate mortgages and millions of dollars. *Id.* He also explained that "[i]f the amount of money were much lower," there would have been "a high probability" of imposing a noncustodial sentence given Carroll's "unblemished background" and "good character." *Id.* at 22. But he also emphasized that Carroll was not "a deprived child living under extenuating circumstances." *Id.* at 22–23. Rather, he said, "[t]he opposite is true." *Id.* at 23. He explained that a noncustodial sentence "would deprecate the seriousness of what [Carroll] ha[d] done and certainly would not have served as . . . general deterrence." *Id.* But "in the end," he said, "a major factor is the amount of money." *Id.*

## V. Post-Sentencing Proceedings

Carroll did not bring a direct appeal. However, represented by new counsel, he filed this motion to vacate his sentence under 28 U.S.C. § 2255. <1>. Carroll alleges that Steinback provided ineffective assistance by (1) neglecting Carroll's case and seeking multiple extensions, (2) failing to inform Carroll about Steinback's disciplinary issues, and (3) failing to properly get Azhari up to speed on the case prior to the sentencing. He also alleges that Azhari provided ineffective assistance by failing to (1) obtain an updated presentence investigation report and (2) make arguments relying on Aslam's one-day sentence.

## LEGAL STANDARD

"The remedy created by section 2255 is a substitute for habeas corpus for federal prisoners." *Morales v. Bezy*, 499 F.3d 668, 670 (7th Cir. 2007). Under § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Although the court has extended Carroll's report date pending disposition of his § 2255 motion, meaning that he is not yet incarcerated, he is nevertheless "in custody" for purposes of § 2255. *See Godoski v. United States*, 304 F.3d 761, 762–63 (7th Cir. 2002) ("A person whose incarceration lies in the future is in custody and has full access to § 2255.").

Ordinarily, claims that could have been raised on direct appeal may not be brought under § 2255. *See Fuller v. United States*, 398 F.3d 644, 648 (7th Cir. 2005). However, ineffective assistance of counsel claims may be raised for the first time under § 2255. *See Massaro v. United States*, 538 U.S. 500, 504 (2003).

## DISCUSSION

### I. Ineffective Assistance of Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Because "a 'criminal prosecution' continues and the defendant remains an 'accused' with all the rights provided by the Sixth Amendment, until a final sentence is imposed," *United States v. Haymond*, 588 U.S. 634, 647 (2019) (plurality opinion), "[t]he precedents . . . establish that there exists a right to counsel during sentencing." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). Furthermore, the Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). In other words, the Sixth Amendment "entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence." *Hinton v. Alabama*, 571 U.S. 263, 272 (2014) (per curiam).

However, to obtain relief, a defendant must "[s]urmount[] *Strickland*'s high bar," which "is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Under *Strickland*, an ineffective assistance of counsel claim "has two components." 466 U.S. at 687. "First, the defendant must show that counsel's performance was deficient." *Id.* "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "The proper measure of attorney performance" is "reasonableness under prevailing professional norms." *Id.* at 688. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "For prejudice at sentencing, the '[defendant] must show that but for counsel's errors, there is a reasonable probability that he would have received a different sentence.'" *Resnick v. United States*, 7 F.4th 611, 625 (7th Cir. 2021) (quoting *Griffin v. Pierce*, 622 F.3d 831, 844 (7th Cir. 2010)).

A court reviewing an ineffective assistance claim can address *Strickland*'s two prongs in either order, and need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Here, there is no need to decide whether counsel's performance was deficient. Because Carroll cannot show prejudice, his ineffective assistance claim must be rejected.

"Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief."

8

*Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005). Thus, although for clarity's sake the court must discuss each of counsel's alleged shortcomings separately, it assesses prejudice as a whole.

### A. Steinback's Multiple Extension Requests

First, Carroll points to Steinback's repeated requests to extend the sentencing date. Carroll does not argue that he lost the benefit of any arguments or evidence due to the repeated delays. Instead, he argues that the sentence Judge Norgle imposed was "a decision to hold Carroll accountable for Steinback's misdeeds." <1> at 9. He points to Judge Norgle's comment, quoted above, that Azhari was "stepping into dangerous waters" by bringing up Steinback. [445] at 8. He argues that Judge Norgle "was plainly frustrated with Steinback," and "bristled at the mention of Steinback's name." <1> at 14. According to Carroll, "Steinback's behavior and the pending discipline against him colored the tone of the sentencing hearing and effected the Court's treatment of Carroll." *Id.*

Neither the law nor the record supports this argument. First, the *Strickland* Court explained that, "[i]n making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge . . . acted according to law." 466 U.S. at 694. In other words, "the assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695. This holding forecloses Carroll's argument, which relies on the assertion that, rather than conscientiously applying the sentencing factors enumerated in § 3553(a), Judge Norgle chose instead to "hold Carroll accountable for Steinback's misdeeds." <1> at 9.

Even if such an assumption was permissible under *Strickland*, it is refuted by the record of the sentencing hearing. Contrary to Carroll's assertion that Steinback's shortcomings "colored the tone of the sentencing hearing," *id.* at 14, the only reference to Steinback was a single, isolated exchange. Even if Judge Norgle was frustrated with Steinback, that does not suggest that he abandoned his objectivity and became biased against Carroll on account of Steinback. *Cf. Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel . . . ordinarily do not support a bias or partiality challenge."). Rather, the transcript demonstrates that Judge Norgle properly focused on Carroll's history and criminal conduct and selected a sentence that punished Carroll for his greed, not his counsel's misdeeds.

Carroll also briefly argues that Azhari "was forced to defend Steinback at the expense of advocating for his client." <1> at 9. But the record refutes that assertion: at no point during the sentencing hearing did Azhari defend Steinback in any respect.

9

Carroll has not shown that his sentence was in any way connected with Steinback's repeated requests to continue the sentencing hearing.

### B. Steinback's Discipline

Next, Carroll points to the discipline Steinback received from the Northern District of Iowa and from the Executive Committee of this court. He correctly notes that, because only Steinback signed the sentencing memorandum, the memorandum violated the Executive Committee's order that cocounsel sign all pleadings in Steinback's cases. However, "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Nix v. Whiteside*, 475 U.S. 157, 165 (1986). Even an attorney's suspension or disbarment does not result in a per se finding of ineffectiveness. *See Bond v. United States*, 1 F.3d 631, 637 (7th Cir. 1993). "Rather, to make out an ineffectiveness claim, [Carroll] must demonstrate that he was prejudiced by an actual error or omission that fell below the range of reasonable, professional, and conscientious representation." *Id.*

Carroll has not done so here. Although the sentencing memorandum should not have been signed by Steinback alone, Carroll does not point to any problems with the substance of the memorandum, and he identifies only one argument that he contends counsel should have made but did not (addressed below). Accordingly, he has not provided any reason to believe that he was prejudiced by Steinback's disciplinary issues.

### C. Steinback's Failure to Get Azhari up to Speed

For the same reason, Carroll's argument that Steinback failed to properly get Azhari up to speed on the case prior to sentencing is not persuasive. With one exception (addressed below), Carroll has not identified how Azhari's arguments at sentencing would have been more persuasive had Steinback done a better job getting Azhari up to speed. Thus, he has not given the court a basis to believe that he was in any way prejudiced by Steinback's failure to communicate with Azhari.

### D. Azhari's Failure to Obtain an Updated Presentence Investigation Report and to Argue Aslam's One-Day Sentence

Carroll's next two arguments are related. First, he argues that Azhari should have obtained an updated presentence investigation report. "This omission was significant," he contends, "because the outdated presentence investigation report did not include or take into account" the fact that Aslam, one of Carroll's codefendants, had received only a one-day sentence. Relatedly, Carroll argues that Azhari should have emphasized Aslam's sentence in his arguments to Judge Norgle. Again, however, Carroll has not shown that there is a reasonable probability that he would have received a lighter sentence had Azhari done so.

In attempting to show prejudice in this context, Carroll faces an uphill battle because he does not dispute that Judge Norgle properly calculated the Guidelines range and imposed a below-Guidelines sentence. This demonstrates that Judge Norgle "necessarily considered the need to avoid unwarranted disparities." *United States v. Seymour*, 94 F.4th 679, 687 (7th Cir. 2024). Indeed, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" is one of the factors a sentencing court "shall consider," regardless of whether a particular argument is raised by counsel. 18 U.S.C. § 3553(a)(6); *see United States v. Durham*, 766 F.3d 672, 685 (7th Cir. 2014) ("Before imposing a sentence, the district court is *required to consider* the sentencing factors in 18 U.S.C. § 3553(a) . . . ." (emphasis added)). It is especially likely that Judge Norgle took Aslam's sentence into account because Aslam's sentence was not imposed by another judge in another court, but rather by Judge Norgle himself.

Additionally, arguments based on codefendants' sentences could have been double-edged. Although Aslam received an effectively noncustodial sentence, Sanders, Lattas, and Barr did not, and Lattas and Barr received sentences even longer than Carroll's. Thus, the court must consider "not just the mitigation" argument (namely, Aslam's sentence) that Azhari "could have presented, but also" the aggravation arguments (namely, Sanders's, Lattas's, and Barr's sentences) "that almost certainly would have come in with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam). "Thus, to establish prejudice, [Carroll] must show a reasonable probability that [Judge Norgle] would have" imposed a shorter sentence "after [he] weighed the entire body of mitigating evidence (including [Aslam's sentence]) against the entire body of aggravating evidence (including [Sanders's, Lattas's, and Barr's sentences])." *Id.*

Carroll has not met this burden. For one, his comparison of his sentence with Aslam's is not persuasive. Carroll argues that he and Aslam had the same Guidelines range and that both cooperated with the Government. <1> at 15. However, as the CFO of the LLC, Carroll played a more central role in the fraudulent scheme. He participated in one of the central acts of the scheme by providing the necessary financial information to be listed on the fraudulent HUD-1 forms at the heart of the scheme. Moreover, unlike Aslam, Carroll was a member of the LLC and thus a direct beneficiary of the ill-gotten gains.

Additionally, the transcript of Aslam's sentencing demonstrates that Judge Norgle relied heavily on significant mitigation that was specific to Aslam. By the time of his sentencing, Aslam had suffered multiple heart attacks and had eleven stents. [475] at 41. Thus, Judge Norgle explained, a custodial sentence would impose a significant burden on both Aslam and the Bureau of Prisons. *Id.* Aslam had also made significant but unsuccessful efforts at obtaining employment, which meant that his wife had to work to meet the family's financial obligations. *Id.* at 39. As a result, Aslam had the primary responsibility for caring for his nine-year-old, autistic, nonverbal, and incontinent child. *Id.* Thus, Judge Norgle found that "[i]f [Aslam] were

11

to leave . . . the home, it would present a tremendous burden on his spouse and family, and they are already heavily burdened." *Id.* at 39–40. He further explained that general deterrence had already been served because "if anyone in society were to know of or learn of or read the record of what has happened to [Aslam] since he committed these wrongs . . . that would be enough of a deterrence." *Id.* at 40. Carroll's § 2255 motion acknowledges this but argues that he "has health issues of his own." <1> at 15; *see also* <13> at 14 ("Carroll is seventy-two years old, he has two jobs, and he has health issues of his own."). This appears to be a reference to the heart problems Azhari discussed at Carroll's sentencing. *See* [445] at 11–12. But Judge Norgle also discussed those health problems and found that they could be adequately treated while Carroll was in custody. *Id.* at 23. And, in contrast to his remarks about Aslam, Judge Norgle noted that Carroll "had a lot of advantages in life." *Id.* at 7.

The record clearly demonstrates that Carroll received a harsher sentence than Aslam because his involvement in the offense was more central and because he lacked the compelling mitigation Aslam presented—not because his counsel did not remind Judge Norgle of the sentence he had given Aslam. Carroll argues that "at the very least, a discussion of Aslam's sentence would have worked to pull Carroll's sentence down, even by a month or two." <13> at 11. To be sure, prejudice does not require "a significant increase in a term of imprisonment." *Glover v. United States*, 531 U.S. 198, 204 (2001). Rather, "any amount of actual jail time has Sixth Amendment significance." *Id.* at 203. But "*Strickland* places the burden on the defendant . . . to show a 'reasonable probability' that the result would have been different." *Belmontes*, 558 U.S. at 27. And that burden is not satisfied by showing merely that some potential avenue of mitigation was not pursued. *See, e.g.*, *Clemons v. McAdory*, 58 F. App'x 657, 662 (7th Cir. 2003). That conclusion follows from two features of *Strickland* doctrine. First, the prejudice analysis recognizes that a sentencer may "find mitigating evidence unpersuasive." *Thornell v. Jones*, 602 U.S. 154, 165 (2024). And second, prejudice "requires a substantial, not just conceivable, likelihood of a different result." *Id.* at 163 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)). Thus, the mere possibility that Judge Norgle would have found an argument based on Aslam's sentence persuasive does not establish *Strickland* prejudice.

Carroll also points to Budzik's sentencing, which postdated his own, as evidence of a reasonable probability that he would have received a lighter sentence had Azhari made the argument based on Aslam's sentence. Budzik's counsel, unlike Azhari, did point to Aslam's sentence, *id.* at 32–33, and Budzik received a sentence of time served, *id.* at 70. Budzik's sentencing, Carroll argues, demonstrates that there is a reasonable probability that he would have received a lighter sentence had his counsel (like Budzik's) pointed to Aslam's sentence.

This argument is not persuasive. First, the undersigned—rather than Judge Norgle, who by then had retired—presided at Budzik's sentencing. Budzik's sentencing is thus of only limited utility in determining what influence an argument based on Aslam's sentence would have had on Judge Norgle, since "district judges

12

may reasonably differ . . . in the relative weight they accord competing circumstances." *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008). Moreover, Budzik and Carroll are not similarly situated. For one thing, Budzik was the first cooperator, and this court recognized at his sentencing that it is the first cooperator who provides the Government with the most valuable assistance in untangling complex financial frauds. [485] at 55. And Budzik, an attorney who participated in the fraudulent closings, did not play as central of a role in the scheme as Carroll. Budzik's sentencing thus does not demonstrate that Carroll was prejudiced by his counsel's performance.

\* \* \*

Under *Strickland*, a defendant claiming ineffective assistance of counsel at sentencing must show not only that counsel's performance was deficient but also "that but for counsel's errors, there is a reasonable probability that he would have received a different sentence." *Resnick*, 7 F.4th at 625 (quoting *Griffin*, 622 F.3d at 844). Because Carroll cannot show prejudice from his counsel's alleged errors— whether in isolation or taken as a whole—he cannot show that his Sixth Amendment rights were violated.

## II. Evidentiary Hearing

In addition to his § 2255 motion, Carroll filed a request for oral argument and/or an evidentiary hearing. [20]. However, "[a] district court has the discretion to deny . . . an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."" *Burkhart v. United States*, 27 F.4th 1289, 1299 (7th Cir. 2022) (quoting 28 U.S.C. § 2255(b)). For the reasons discussed above, the records in this case and the underlying criminal case make clear that Carroll cannot show prejudice from his counsel's performance. Moreover, the only evidence Carroll points to that he would present at an evidentiary hearing is evidence regarding Budzik's sentencing. [20] at 4. However, that evidence is already in the record of the underlying criminal case. Thus, an evidentiary hearing is not necessary. Accordingly, Carroll's request for oral argument and/or an evidentiary hearing, [20], is denied.

## III. Certificate of Appealability

The court also declines to issue a certificate of appealability. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Here, reasonable jurists would not debate whether

13

Carroll has demonstrated *Strickland* prejudice. Accordingly, the court declines to issue a certificate of appealability.

## CONCLUSION

Carroll's motion to vacate or set aside his sentence, [1], is denied, and the court declines to issue a certificate of appealability.

Dated: August 22, 2025                        /s/ Martha M. Pacold